UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| COREY LONGS, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | CAUSE NO. 3:02-CV-221RM |
| ) | |
| THE CITY OF SOUTH BEND, ) | |
| INDIANA, OFFICER JAMIE ) | |
| BUFORD, and POLICE SERGEANT ) | |
| SCHMIDT, ) | |
| ) | |
| Defendants ) | |

OPINION AND ORDER

This case presents two of the more diametrically opposed factual recitations that this court has seen. Plaintiff Corey Longs contends that Sgt. Jamie Buford violated his right to be free from unreasonable searches when Sgt. Buford and other South Bend police officers entered his residence three and a half years ago. The court conducted a bench trial on September 27 and 28, 2005. At the conclusion of the plaintiff's case in chief, the court entered judgment for defendants Sgt. Schmidt and City of South Bend pursuant to FED. R. CIV. P. 50(a); the reasons for that ruling were stated adequately at the time of the ruling. This opinion is intended to satisfy the court's obligations under FED. R. CIV. P. 52 to find facts and state its conclusions with respect to Mr. Longs's claim against defendant Sgt. Jamie Buford.

Both sides agree that South Bend police officers entered Mr. Longs's residence around 9:00 a.m. on February 21, 2002 and searched the residence. They agree on little else.

*The Plaintiff's Version of the Facts*

The plaintiff's version is this: Mr. Longs, whose bedroom shares a wall with the front porch, awoke to the sound of someone kicking in the locked front door between the porch and the outside. He peeked out his window and saw Sgt. Buford kicking the locked door between the porch and the interior, and other officers present on the porch. Mr. Buford emerged from the bedroom and spoke with friends who had spent the night—Donald Anderson and 16-year-old Tetra Winston—who said the police had warrants and that Mr. Buford should let them in. Mr. Anderson and Ms. Winston both thought warrants had been issued for their arrests, so they ran to the basement to hide.

Mr. Longs asked who was at the door, and was told, "South Bend Police Department, open the door." Mr. Longs opened the door a quarter of the way. Sgt. Buford said the police had a call that someone was being held against his or her will in the home. Mr. Longs said was no one was being held against their will. Sgt. Buford asked whose house it was, and Mr. Longs said it was his. Sgt. Buford asked who was in the house, and Mr. Longs listed his aunt, his grandmother, and his son. If no one was being held against their will, said Sgt. Buford, Mr. Longs

2

had nothing to worry about in letting them search. Mr. Longs said that if Sgt. Buford got a search warrant, he would allow the search.

Mr. Longs had long believed the South Bend police were out to get him. Four years earlier, he had settled a claim against the city in which he alleged an unlawful search. He had consulted the N.A.A.C.P. and his brother (a police officer in Michigan) about what to do if the police appeared at his door. His brother had told him to refuse requests for warrantless entry and call the police station to report an attempted unlawful search.

As Mr. Longs tried to shut the door, Sgt. Buford held the door open with his left arm and struck Mr. Longs in the nose with his right hand (Mr. Longs described an open fist; another plaintiff's witness described a closed fist). The officers entered the house. Sgt. Buford ordered Mr. Longs to sit on the couch and yelled that anyone else in the house should come out immediately or they would get hurt. Mr. Longs's grandmother, preschool-aged son, and aunt all sat with Mr. Longs on a couch at the officers' direction. Sgt. Buford had one gun in his hand (pointed toward the ground) and another gun in his holster. Mr. Longs's grandmother, who was taking medication that caused frequent urination, asked to use the bathroom, but was told she had to remain on the couch; she was unable to control her bladder for the remainder of the officers' stay.

The police started going through house, searching everything. The officers mentioned nothing about looking for someone for whom they had an arrest warrant. Photographs show a mess left behind by the officers, with mattresses

3

having been overturned and drawers having been emptied. The police found Mr. Anderson and Ms. Winston in the basement. The police said Ms. Winston wasn't supposed to be there. One officer asked Ms. Winston where Mr. Longs's guns and drugs were. The officers took Ms. Winston to an apartment complex across town, telling her they were looking for a man. The police then returned her to Mr. Longs's residence.

*The Defendant's Version of the Facts*

Sgt. Buford's version of the facts is this: South Bend police received information from authorities in Arkansas that James Hamilton, who was wanted for armed robbery and was considered dangerous, was at an address in the 1600 block of Huey Street. Sgt. Buford went to that address with four to five other uniformed officers, each arriving in an individual squad car. The fugitive wasn't at the Huey Street residence, but Mr. Hamilton's ex-girlfriend told the police she thought Mr. Hamilton was hanging out with a friend named "Corey" on Kenwood Street, and described Mr. Hamilton's car for the police. The officers set out for Kenwood Street.

Upon arriving at Mr. Longs's residence, Sgt. Buford and two other officers went to the front of the house and two others others went to the rear. Sgt. Buford opened an unlocked screen door leading from the outside onto the porch, and walked up to the wooden door between the porch and the interior. Sgt. Buford knocked several times on that door with the flashlight he held in his left hand

4

essentially for the entire encounter, announcing while knocking that it was the police. Sgt. Buford heard commotion on the other side of the door, but received no immediate response to his knocking.

Mr. Longs, whom Sgt. Buford didn't know, opened the door about ten inches and identified himself. Sgt. Buford told Mr. Longs the police were looking for James Hamilton and explained why. Mr. Longs said Mr. Hamilton wasn't there. Sgt. Buford asked if the police could come in and look, so they could eliminate one of the addresses they had for Mr. Hamilton. Mr. Longs agreed, and opened the door. Sgt. Buford did nothing to injure Mr. Longs, and used no force to get into the house.

The South Bend Police Department provides its officers with written consent forms for searches. The use of written consent forms is not required, and Sgt. Buford didn't use one at Mr. Longs's house. Mr. Longs had no involvement with the case and was not a suspect.

A number of people were in the house: a small youth, an elderly lady, and several younger people who were not seen right away. Sgt. Buford, who did most of the talking, asked everyone to sit on the couch and explained to Mr. Longs's grandmother what was going on. Sgt. Buford went upstairs with another officer behind him. At the top of the stairs, Sgt. Buford found a man and woman in bed. The man didn't match Mr. Hamilton's photograph. The officers walked around the upstairs, but did not turn any beds over.

5

Once Sgt. Buford returned to the first floor, other officers reported that they had secured the rooms on that floor. Sgt. Buford asked Mr. Longs if there was a basement, and Mr. Longs said there wasn't. As the officers started to leave, Sgt. Buford heard a noise from below the floor. He asked Mr. Longs again, and Mr. Longs again denied the basement's existence. Sgt. Buford headed for the back door, and found a basement door that could not be seen from the front part of the house. Sgt. Buford then drew his pistol for the first time in the encounter, shouted that they were police officers, and ordered anyone in the basement to come out with their hands up. When nobody came out, the officers went down and found a male and a female hiding in basement.

Mr. Longs told Sgt. Buford he lied about the basement because he was scared. Sgt. Buford shook his hand and asked him to call the police if Mr. Hamilton returned. The dealings between Sgt. Buford and Mr. Longs were not hostile, and no officers used force on Mr. Longs at the residence.

When Sgt. Buford told Ms. Winston that the officers were looking for James Hamilton, she said she knew him and that Mr. Longs had dropped Mr. Hamilton off with his car at LaSalle Park Homes. She offered to show the police officers where that had occurred, and went with the officers to the apartment.

*Analysis of Credibility*

6

If Mr. Longs has proven, by a preponderance of the evidence, that Sgt. Buford conducted a warrantless, non-consensual search of Mr. Longs's residence, Mr. Longs is entitled to recover damages.

Mr. Longs is not a reliable reporter of what the South Bend police do with respect to him. For whatever reason, Mr. Longs appears—in the words of a layman, not a mental health professional—to be delusional and paranoid with respect to South Bend police officers. Mr. Longs has relocated from South Bend to Carmel, Indiana, some 120 miles to the south, but believes South Bend officers continue to harass him: he believes South Bend officers follow him to and from work, using Fishers, Indiana, police cars, on a daily basis. He believes he was stopped by South Bend police 30 or more times between 1998 and 2002. He believes he tried to make complaints on as many as ten occasions with Lt. John Collins of the South Bend Police Department's internal affairs department; Lt. Collins testified credibly that this case presented the only occasion in which Mr. Longs tried to make such a complaint.

That Mr. Longs is an unreliable reporter of South Bend police action doesn't mean he cannot carry his burden of proof. It means only that his testimony is worth little standing alone, and requires more corroboration than testimony of another plaintiff might require.

In an attempt to provide that corroboration, Mr. Longs presented the testimony of an eyewitness—his grandmother, Bonnie Williams. Ms. Williams was quite confused when she testified. She said the police were already in the house

7

when she obeyed Sgt. Buford's order to come downstairs, but she also described the officers' entry, and what Mr. Longs had done before the police entry. Despite gentle questioning from both sides, there were several questions that Ms. Williams either couldn't hear or couldn't understand. The court believes that by the time of trial, 44 months after the incident, Ms. Williams could no longer reliably separate what she saw from what she was told.

On the other hand, Ms. Williams remembered and related an instance of personal humiliation resulting from orders to stay on the couch rather than go to the bathroom. Unless officers gathered occupants on the couch in the Kenwood residence more than once (and no credible evidence suggests that), it seems quite likely that Ms. Williams's personal humiliation occurred during the events of February 21, 2002. The incident is far more consistent with Mr. Longs's version than with Sgt. Buford's version.

Mr. Longs also presented the testimony of another eyewitness—Ms. Winston, the juvenile who hid in the basement because she believed a warrant had been issued for her arrest. Ms. Winston corroborated some of Mr. Longs's testimony. She said that she had been sleeping on the living room couch near the front door when she was awakened by loud noises and banging on the front porch. She testified that she looked through the door's peephole and saw officers beating on the door with their hands. Ms. Winston said she waited at the top of the basement steps before descending, and saw Mr. Longs open the front door a little bit. She said she heard Mr. Longs ask if the police had a search warrant, and

heard an officer say someone in house was being held against their will.[1] She testified that the officer then hit Mr. Longs in the nose with a closed fist, and she went into the basement. She said that while in the basement, she heard lots of bumping and things being thrown around. Ms. Winston testified that when the police took her back upstairs, the house "was messed up."

Ms. Winston is not a disinterested eyewitness. She now resides with Mr. Longs in Carmel.

Mr. Longs presented his hospital record from February 21, 2002. As the defense noted, Mr. Longs didn't present himself at the hospital until nine hours after the incident. But he did present himself at the hospital, reporting pain in the bridge of his nose since being struck there that morning. The records disclose a clinical impression of a nasal contusion. That Mr. Longs is an unreliable reporter of conduct by the South Bend police doesn't suggest that he would have struck himself in the nose following an encounter with the police.

Mr. Longs also presented nine photographs that show the residence in considerable disarray. Mr. Longs says he took the photos on February 21, after fixing the damaged porch door jamb and borrowing a camera from his mother. He, Ms. Williams, and Ms. Winston all testified that the photos reflect the house's

---

[1] As is discussed below, Sgt. James Dennin, who was on the porch with Sgt. Buford, testified credibly that he couldn't hear the conversation between Sgt. Buford and Mr. Longs when the officers were on the porch. The court does not believe that Ms. Winston could hear Sgt. Buford's statements from the other side of the door. The court believes that Ms. Winston, like (but to a far lesser extent than) Ms. Williams, had difficulty separating, 44 months later, what she saw and heard from what she was told about.

9

condition immediately after the police visit. The photos depict disarray that could not be expected to result from a search for a fugitive: mattresses are separated from box springs; drawers have been emptied.

The photographs provide strong corroboration for Mr. Longs's version of the facts. The photos are not, of course, conclusive—Mr. Longs and his family might have tossed the house themselves before taking the photos, hoping to pin a case on the South Bend police (echoing what Mr. Longs describes as the police having planted drugs on him in 1998). The quickness with which Mr. Longs reported the incident to a newspaper reporter (discussed below) might support such a view of the evidence. But again, that Mr. Longs has, in a layman's view, paranoid delusions about conduct by the South Bend police doesn't suggest that he would purposely stage an unfavorable encounter with the police.

Sgt. Buford was a far more credible witness than was Mr. Longs, but three aspects of the case undermine his testimony. First, Sgt. Buford denies any problems related to Mr. Longs's grandmother, Ms. Williams. As already noted, the court is skeptical of much of Ms. Williams's attempts at recollection during trial, but the court thinks it highly improbable that she would fabricate her tale of urinating on herself. Second, Sgt. Buford testified with certainty and detail about having found a man and woman in the bed in the upstairs bedroom. He related the woman's anger at the officers' entry, and reported comparing the man's face to a photograph of Mr. Hamilton. No other witness mentioned a man in the

residence other than Mr. Longs and Donald Alexander, who was hiding in the basement.

Third, there are the photographs. The court can find no way to believe Sgt. Buford's testimony without believing that Mr. Longs staged the photographs. Mr. Longs could not have staged the photographs without the connivance of his grandmother, who struck the court as unlikely to be lying on the witness stand. And notwithstanding all the court has said about Mr. Longs's apparent delusions, Mr. Longs didn't strike the court as one who would have set up the police officers for a false claim within hours of their departure from an encounter of the sort Sgt. Buford described.

Sgt. Buford, too, presented the testimony of an eyewitness—Cpl. James Dennin, a 20-year police veteran who accompanied Sgt. Buford onto the porch and through the front door. Cpl. Dennin testified that no force was used to enter the porch, and that while he couldn't hear Sgt. Buford's conversation with Mr. Longs, Sgt. Buford didn't appear to use force on the door or on Mr. Longs to gain entry.

Cpl. Dennin's recollection of the ensuing events was not good. As has been noted already, 44 months separated the search from the trial. The defense argues that such lapses in recollection actually support Sgt. Buford's version of the facts: because the events of February 21 were so commonplace and well within the ordinary, neither of the officers had any reason to maintain an especially strong

11

recollection. This may be so, but there is little in the record to allow the court to know what would be unexceptional to Cpl. Dennin.

Sgt. Buford had reason to remember the events surrounding the search at Kenwood, though. Less than two weeks after the incident, a local newspaper columnist telephoned Capt. John Williams, the South Bend Police Department's public information officer, to ask about the search at the Longs residence. Capt. Williams asked Sgt. Buford about the incident, and believes Sgt. Buford told him that the officers heard voices in the residence and forced their way in. Capt. Williams believes he relayed that information to the columnist, and that's the way the story appeared in the newspaper on March 7, 2002.

Sgt. Buford denies telling Capt. Williams anything other than what he told this court, and says he was especially upset by what Mr. Longs was telling the newspaper because he had shaken hands with Mr. Longs in the kitchen just before leaving, and thought he had left on good terms.

In light of all these considerations, the court cannot be wholly confident of what happened on Kenmore Street that Saturday morning. All in all, though, the court believes that Mr. Longs's version is more likely true than Sgt. Buford's.

First and most importantly, there are the photographs. The court believes it unlikely, even with Mr. Longs's irregular views of the behavior of South Bend police, that Mr. Longs tossed his own home after the police left to set up a claim against the police, and persuaded his grandmother and Ms. Winston to support his story. That might have happened, but it seems unlikely.

Second, there is the undisputed behavior of Mr. Longs, Ms. Winston, and Mr. Alexander. The latter two hid because they thought they would be arrested if found. Given that Mr. Longs previously sought advice from his brother about his right to refuse warrantless entry, it seems less likely that Mr. Longs would have voluntarily admitted Sgt. Buford for a consensual search, knowing that people (though not Mr. Hamilton) were hiding from the police in the basement. Perhaps that is what happened (the court assumes Mr. Longs's brother didn't tell him to lie to police about the existence of a basement, but Mr. Longs lied), but it seems less likely. Further, Mr. Longs lied about the basement's existence, which is more inconsistent than consistent with his having admitted the police to look for Mr. Hamilton.

Third, there is Capt. Williams's statement to the newspaper reporter. Capt. Williams's memory was imperfect, but an experienced and accomplished police spokesman's statement that officers forced their way into a home seems more inconsistent than consistent with a search to which the complaining party consented.

None of these factors is dispositive; certainly none firmly establish what happened. In light of all the evidence discussed above, though, they combine to persuade the court that Mr. Longs has carried his burden of proof.

*Damages*

Mr. Longs testified without contradiction that his landlord deducted $250 from his damage deposit because of the damage to the door. In light of the photograph of the door jamb, the court finds that testimony credible. The hospital records indicate that Mr. Longs's visit to the hospital cost him $105. Mr. Longs's special damages amount to $355.

Mr. Longs testified that his nose hurt for about two weeks after the incident. The medical records lead the court to believe the pain was not severe, and so awards $100 per day for the first week ($700) and $50 per day for the second week ($350) for a total of $1,050 for physical pain and suffering.

Mental suffering is a more challenging issue. Mr. Longs and Ms. Winston testified that Mr. Longs has been upset and suffered nightmares since the incident. To separate the effects of the February 2002 incident from those of the 1998 incident in which Mr. Longs was charged with a felony (and since which he seems to have faced worsening delusions concerning the South Bend police) is nearly impossible without the aid of expertise in psychiatry or psychology. The record doesn't provide the benefit of such expertise. Indeed, Mr. Longs sought mental treatment only once, earlier in 2005, and didn't return for further counseling.

Mr. Longs, conceding the difficulty of determining damages for his mental distress, invokes the doctrine of presumed damages:

> Presumed damages are a *substitute* for ordinary compensatory damages, not a *supplement* for an award that fully compensates the alleged injury. When a plaintiff seeks compensation for an injury that

> is likely to have occurred but is difficult to establish, some form of presumed damages may possibly be appropriate. In those circumstances, presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure.

Memphis Com'y Sch. Dist. v. Stachura, 477 U.S. 299, 310-311 (1986) (emphasis in original, citation omitted). Mr. Longs requests an award of $100,000 as presumed damages.

The doctrine of presumed damages doesn't relieve a plaintiff of the obligation to prove damages by a preponderance of the evidence; it simply allows an award to compensate for a proven injury that is difficult to quantify. Mr. Longs has persuaded the court that it is more likely than not that he incurred mental suffering as a result of the February 2002 violation of his constitutional right to be free from unreasonable search, but given his pre-existing mental condition and the lack of any post-incident effort to obtain treatment, the court is not persuaded that the amount of $100,000 would roughly approximate the harm he suffered. The sum of $10,000 is such a rough approximate, and the court awards that sum for mental suffering.

Mr. Longs also seeks an award of punitive damages. The court is persuaded that Sgt. Buford's conduct reflected complete indifference to Mr. Longs's constitutional rights, and so was in reckless disregard of Mr. Longs's rights. See Smith v. Wade, 461 U.S. 30, 56 (1983). The defense simply has articulated no other way of viewing the conduct, once the court has concluded that Mr. Longs's is the more likely version of the facts, and the court cannot conceive of any other

way of viewing the events. Punitive damages are both permissible and appropriate, and the sum of $25,000 appropriately reflects the factors set forth in <u>Pacific Mutual Life Ins. Co. v. Haslip</u>, 499 U.S. 1 (1991).

*Conclusion*

Though the court cannot be certain of what happened, the court is persuaded, especially by the photographic evidence, that it is more likely than not that Sgt. Buford and other police officers who entered Mr. Longs's residence in February 2002 did so in violation of Mr. Long's constitutional rights. Mr. Longs has not shown that Sgt. Schmidt or the City of South Bend participated in that constitutional violation. The court finds for the plaintiff and against Sgt. Buford and awards Mr. Longs compensatory damages in the sum of $11,405 and punitive damages in the sum of $25,000 for a total award of $36,405. The clerk shall enter judgment accordingly, and shall also enter judgment for the City of South Bend and Sgt. Schmidt on Mr. Longs's claims against them.

ENTERED:   October 4, 2005

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

cc:   J. Kimmel
      J. Broden